UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| LAZALE ASHBY,<br><br>    Plaintiff,<br>v.<br><br>ANGEL QUIROS, SCOTT SEMPLE, WILLIAM MULLIGAN, WARDEN FANEUFF, GREGORIO ROBLES, CHERYL CAPELAK & MONICA RINALDI,<br><br>    Defendants. | Civil Action No.<br>3:17-CV-916 (CSH)<br><br><br>DECEMBER 20, 2018 |

## RULING ON DEFENDANTS' MOTION TO DISMISS

**HAIGHT, Senior District Judge:**

*Pro se* Plaintiffs Jesse Campbell and Lazale Ashby's consolidated action concerns conditions of their incarceration at Northern Correctional Institution ("Northern"). *See* Doc. 1 ("Ashby Compl.") and Complaint, *Campbell v. Quiros*, No. 3:17-cv-946 (CSH) (D. Conn. June 8, 2017), ECF No. 1 ("Campbell Compl."). The Defendants Angel Quiros, Scott Semple, William Mulligan, Warden Faneuff, Gregorio Robles, Cheryl Capelak, and Monica Rinaldi move to dismiss both Plaintiffs' complaints in their entirety. This Ruling resolves Defendants' motion.

### I. BACKGROUND

Plaintiffs Ashby and Campbell are death row inmates at Northern.[1] Ashby Compl. ¶ 13;

---

[1] Connecticut abolished the death penalty in 2012, and those who were on "death row" no longer face execution. However, this ruling will refer to Plaintiffs and their fellow inmates as prisoners on "death row," in keeping with the terminology in their Complaints and other filings in this action. *See Ashby v. Quiros*, No. 3:17-cv-916 (CSH), 2018 WL 2324081, at *2 n.1 (D. Conn. 2018).

Campbell Compl. ¶ 13. Following an altercation between a corrections officer and another inmate on death row, prison officials imposed a lockdown on the death row unit in March 2010. Ashby Compl. ¶¶ 12–14. The lockdown had two consequences important to Plaintiffs.

First, they were put on full restraint status. *Id.* ¶ 16. This meant that prison officials placed handcuffs, leg shackles and a tether chain on Plaintiffs every time they left their cells. *Id.* This policy—requiring death row inmates to be placed either in handcuffs, leg shackles and a tether chain or in handcuffs behind the back whenever they were escorted from their cells—was subsequently memorialized by Defendant and then-Warden Quiros in a policy recommendation memorandum. Ashby Compl. at 21 (Ex. A, "Death Row Restraint Policy Recommendation"). No notice had been given, no hearing held, and no process allowed during this period for Plaintiffs to challenge the policy. *Id.* ¶¶ 19–21.

Other death row inmates who had been resentenced in the months prior to the filing of Plaintiffs' complaints were not subject to the out-of-cell restraint policy, could engage in two extra hours of recreational activities, and were allowed to use all of the equipment in the prison gym.[2] *Id.* at ¶¶ 38–39; 44–47. Prison staff subjected Plaintiffs to the restraint policy from the March 2010 lockdown until a change in policy on January 1, 2018. Declaration of Captain Robles, *Campbell v. Quiros*, No. 3:17-cv-946 (CSH) (D. Conn. May 11, 2018), ECF No. 28-1; Order Amending Initial Review Order, *Campbell v. Quiros*, No. 3:17-cv-946 (CSH) (D. Conn. May 21, 2018), ECF No. 31.

Second, Plaintiffs were removed from their tierman/janitor jobs, for which they had received "Level Two" pay, or $1.25 per day, after the imposition of the restraint policy. Ashby Compl. ¶¶ 27,

---

[2] The Supreme Court of Connecticut directed that, following the abolishment of the death penalty in the state, remaining death row inmates should be resentenced. *State v. Santiago*, 122 A.3d 1, 84–85 (Conn. 2015), *aff'd*, *State v. Peeler*, 140 A.3d 811 (Conn. 2016).

29. They were instead given a job with unspecified work duties with "Level One" pay, or $0.75 per day. *Id.* ¶ 30. Defendants allegedly gave them these Level One positions because Defendants believe they are required, by Connecticut law, to provide work assignments for death row inmates whose cases remain on direct appeal. *Id.* Plaintiffs allege that other death row inmates were allowed to keep their jobs. Ashby Compl. ¶ 35; Campbell Compl. ¶ 37.

Plaintiffs individually filed lawsuits arguing that the out-of-cell restraint policy and employment termination violated various laws. Ashby Compl.; Campbell Compl. Following this Court's initial review orders, these claims remained in both cases:

> The Fourteenth Amendment equal protection claims as to the imposition of the out-of-cell restraint policy on the class of death row prisoners who have yet to be resentenced, and as to Plaintiff[s'] lack of employment on a class-of-one theory, as well as the Fourteenth Amendment due process claim related to the initial imposition of an out-of-cell restraint policy on Plaintiff[s] and the continued imposition of that policy on Plaintiff[s], and the loss of Plaintiff[s'] job[s] and continued denial of employment to Plaintiff[s].

*Ashby v. Quiros*, No. 3:17-CV-916 (CSH), 2018 WL 2324081, at *11 (D. Conn. May 22, 2018); *Campbell v. Quiros*, No. 3:17-CV-946 (CSH), 2018 WL 888723, at *11 (D. Conn. Feb. 13, 2018).

Campbell's resentencing in April 2018 mooted two of these claims, and this Court amended the initial review order for his complaint accordingly. Order Amending Initial Review Order, *Campbell v. Quiros*, No. 3:17-cv-946 (CSH) (D. Conn. May 21, 2018), ECF No. 31. In Campbell's lawsuit, the following claims survived: (1) a due process claim as to the initial imposition of the out-of-cell restraint policy, (2) a due process claim as to the loss of his job and continued denial of employment to Plaintiff, and (3) an equal protection claim as to his lack of employment on a class-of-one theory. *Id.* The Court will consider *infra* the effect of Ashby's June 2018 resentencing on his

3

claims. *See* David Owens, *Ex-Death Row Inmate Lazale Ashby Resentenced to Life Without Possibility of Release*, Hartford Courant (June 20, 2018, 3:30 PM), https://www.courant.com/news/connecticut/hc-lazale-ashby-resentenced-to-life-0621-story.html. The Court consolidated Ashby and Campbell's cases on May 22, 2018. Doc. 12. Defendants now seek dismissal of both Plaintiffs' complaints.

## II. STANDARD OF REVIEW

"On a motion to dismiss, the issue is 'whether the claimant is entitled to offer evidence to support the claims.'" *Patane v. Clark*, 508 F.3d 106, 111 (2d Cir. 2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1984)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard creates a "two-pronged approach" based on "[t]wo working principles." *Iqbal*, 556 U.S. at 678–79.

First, all factual allegations in the complaint must be accepted as true, and all reasonable inferences must be drawn in the favor of the non-moving party. *See id.; see also Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 591–92 (2d Cir. 2007) (citation omitted). The presumption of truth does not extend, however, to "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. Second, "a complaint that states a plausible claim for relief" will survive a motion to dismiss and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679) (quotation marks omitted). "Dismissal under

4

Federal Rule of Civil Procedure 12(b)(6) is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" *Associated Fin. Corp. v. Kleckner*, 480 F. App'x 89, 90 (2d Cir. 2012) (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).

With respect to *pro se* litigants, it is well-established that "[*p*]*ro se* submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam)). *See also Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (same)*; Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants); *Boykin v. KeyCorp.*, 521 F.3d 202, 214 (2d Cir. 2008) ("A document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (instructing that where the plaintiff proceeds *pro se*, a court is "obliged to construe his pleadings liberally") (quoting *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) ("In reviewing a *pro se* complaint, the court must assume the truth of the allegations, and interpret them liberally to "raise the strongest arguments [they] suggest[].").

Despite being subject to liberal interpretation, a *pro se* plaintiff's complaint still must "state a claim to relief that is plausible on its face." *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quoting *Iqbal,* 556 U.S. at 678). Therefore, even in a *pro se* case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v.*

*Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted). Nor may the Court "invent factual allegations" that the plaintiff has not pleaded. *Id.*

### III. DISCUSSION

A. <u>**Effect of Ashby's June 2018 Resentencing**</u>

After Plaintiff Campbell was resentenced in April 2018, the Court considered the question of what impact his resentencing had on his pending claims. The Court now turns to this same question for Plaintiff Ashby, who was resentenced in June 2018.

In Campbell's action, the Court concluded that his resentencing mooted two aspects of his claims: "(1) his Fourteenth Amendment due process claim as to the *continued* application of the out-of-cell restraint policy on his person; and (2) his Fourteen Amendment equal protection claim as to the imposition of the out-of-cell restraint policy on the class of death row prisoners who have yet to be resentenced." Order Amending Initial Review Order, *Campbell v. Quiros*, No. 3:17-cv-946 (CSH), at *5 (D. Conn. May 21, 2018), ECF No. 31. These claims were mooted because the prison no longer imposed the out-of-cell restraint policy on Campbell once his resentencing removed him from death row, taking away his standing to bring these claims. *Id.*

Defendants represent that Ashby was also no longer subject to the out-of-cell restraint policy once he had been resentenced in June 2018 and argue that this change, like in Campbell's case, moots Ashby's claims based on the continued imposition of the out-of-cell restraint policy. Doc. 21-1 ("Defs. Mem.") at 39–40. Ashby does not provide a counterargument, deferring this matter to the Court. Doc. 24 ("Ashby Mem.") at 31. Resentencing appears to have had the same effect on Ashby's case as it did in Campbell's case: Ashby similarly no longer has standing to bring such claims. The Court sees no reason to deviate from its order amending Campbell's initial review order.

6

Accordingly, as in Campbell's lawsuit, the following claims survive from Ashby's complaint: (1) a due process claim as to the initial imposition of the out-of-cell restraint policy, (2) a due process claim as to the loss of his job and continued denial of employment to Plaintiff, and (3) an equal protection claim as to his lack of employment on a class-of-one theory. The Court now turns to examining the Defendants' challenges to these surviving claims.

**B.**     **<u>Due Process Claim as to the Initial Imposition of the Out-of-Cell Restraint Policy</u>**

Defendants assert that qualified immunity shields them from liability regarding the initial imposition of the out-of-cell restraint policy. Doc. 21 at 1. The doctrine of "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). It "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Defendants have not sufficiently argued they are entitled to qualified immunity with respect to the entirety of the initial period in which Plaintiffs were placed in restraints when transiting between secure locations.

Qualified immunity applies where a government official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix*, 136 S. Ct. at 308 (quoting *Pearson*, 555 U.S. at 231 (internal citation omitted)). Plaintiffs rely on *Saucier v. Katz*, 533 U.S. 194 (2001), for the proposition that courts must follow a mandated two-step order to resolve qualified immunity cases. Ashby Mem. at 6.[3] In *Saucier*, the Supreme

---

[3] Ashby and Campbell filed memoranda in opposition of Defendants' motion to dismiss that were virtually identical. This Ruling will reference only Ashby's memorandum for simplicity's sake.

Court held that the initial inquiry *must* be whether "the facts alleged show the officer's conduct violated a constitutional right," and only after this step could a court determine "whether the right was clearly established." 533 U.S. at 201. However, the Supreme Court receded from this approach in *Pearson v. Callahan*, finding that "the judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case." 555 U.S. at 242.

Although the order of inquiry as mandated by *Saucier* was meant to develop constitutional precedence, the Supreme Court recognized that "procedure often fail[ed] to make a meaningful contribution to such development." *Id.* at 237. "[C]ases in which the constitutional question is so factbound" are one example of where little contribution to the jurisprudence may be found. *Id.* The instant issue appears to be one those instances where this Court would not meaningfully develop constitutional precedence. The issue arises as a consequence of Connecticut phasing out its class of death row prisoners after the abolition of the death penalty. Neither Plaintiffs nor any person will be sentenced to death in this state again, meaning determination of the exact constitutional right at issue here has no precedential value. Accordingly, the Court will not extensively explore the question of whether a constitutional right was violated by the initial imposition of the out-of-cell restraint policy and instead focus on whether this imposition violated clearly established law.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)). The qualified immunity "inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Pearson v. Callahan*, 555 U.S. 23, 244 (2009) (quoting

8

*Wilson v. Layne*, 526 U.S. 603, 614 (1999)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "The inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308.

Because the Plaintiffs' removal from death row mooted the question of the validity of *continued* imposition of the out-of-cell restraint policy, the Court is limited to considering only whether Defendants are entitled to qualified immunity with respect to the initial imposition of the policy, which lasted almost eight years.[4] Interestingly, Judge Underhill of this Court has already touched on whether this exact policy violated the Due Process Clause, holding that another death row inmate at the same correctional institution "has stated a plausible claim that he possessed a liberty interest in being free of out-of-cell restraints and the defendants failed to provide him with procedural due process in connection with his placement on this restraint status."[5] *Reynolds v.*

---

[4] The Court defines this as the period between the placement of Plaintiffs on full restraint status in March 2010 and when they were no longer subject to the out-of-cell restraint policy on January 1, 2018, which is when the policy was purportedly changed so that "[n]o restraints were used for all in and out of unit movements." Declaration of Captain Robles, *Campbell v. Quiros*, No. 3:17-cv-946 (CSH), at *3 (D. Conn. May 11, 2018), ECF No. 28-1; *see also* Ashby Mem. at 9.

[5] Plaintiffs here also allege they were deprived of a protected liberty interest. "In order to state a claim for a denial of procedural due process . . . a prisoner must allege that he possessed a protected liberty interest, and was not afforded the requisite process before being deprived of that liberty interest." *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000). "To constitute a deprivation of liberty, a restraint must have imposed an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Coleman v. Commissioner of Correction*, 958 A.2d 790, 793 (Conn. App. Ct. 2008) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). A prisoner must also "establish that 'the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint.'" *Cruz*, 202 F.3d at 597 (quoting *Frazier v. Coughlin*, 81 F.3d 313, 3217 (2d Cir. 1996)). It is also worth noting that the *Reynolds* case and this case have one Defendant in common: Angel Quiros. *See Reynolds v. Murphy*, No. 3:13-cv-316 (SRU), 2015 WL 1456880 (D. Conn. Mar. 30, 2015).

*Murphy*, No. 3:13-cv-316 (SRU), 2015 WL 1456880, at *4 (D. Conn. Mar. 30, 2015). Factors supporting Judge Underhill's decision in *Reynolds* were the long duration of the policy and that inmates in the general population were permitted to move outside of their cells without being restrained. *Id.* This Court agrees with the *Reynolds* decision.

As for the first requirement for qualified immunity, the law clearly establishes that a lengthy deprivation of a liberty interest without procedural protections is in violation of the Due Process Clause. "Since *Sandin*, the focus in prison due process litigation has been on whether the degree and duration of the inmate's confinement implicates a state-created liberty interest." *Laws v. Cleaver*, 140 F. Supp. 2d 145, 150 (D. Conn. 2001). Although no case has defined exactly how long an inmate can be placed in out-of-cell restraints or under similar conditions, eight years of restrictive confinement surely meets the requirement for a violation. For example, the Second Circuit declared that 305 days of confinement in segregated housing was a "sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000). See also *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) ("The conditions and their duration must be considered since . . . somewhat harsh conditions endured for a prolonged interval might . . . be atypical."). It may well be that the law allows Defendants to place Plaintiffs under restraints when being transported between secure locations for some period of time, but the law is clear that eight years of this practice is much too long.

Defendants misconstrue the standard for clearly established law under the qualified immunity analysis. They assert that Plaintiffs "must identify a case from the Supreme Court or the Second Circuit holding that placement of inmates under a sentence of death in mechanical restraints for brief movements between secure locations such as their cell and a recreation location and during

professional visits required notice and hearing." Defs. Mem. at 23. This misrepresents the issue and the standard. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point."); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017) ("It is not necessary, of course, that the very action in question has previously been held unlawful. That is, an officer might lose qualified immunity even if there is no reported case directly on point.") (internal quotation marks and citations omitted). Rather, a "clearly established" law is one that either the Supreme Court or the Second Circuit's decisions "clearly foreshadow a particular ruling on the issue." *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000) (internal quotation marks and citations omitted); *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (declaring that absence of a decision" directly addressing the right at issue" will not automatically shield officials with qualified immunity). The issue is the usage of restraints for an inordinate length time and implemented for a reason that has long ago passed, which precedent has steadfastly recognized as a liberty interest. *See Youngberg v. Romeo*, 457 U.S. 307, 216 (1982) ("Liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action. This interest survives criminal conviction and incarceration."); *Benjamin v. Fraser*, 264 F.3d 175, 188 (2d Cir. 2001).

Defendants use the fact that inmates are regularly secured in restraints when being transported to court and that death row inmates are automatically classified to the highest risk score category of five as justification for the out-of-cell restraint policy. Defs. Mem. at 17, 18–19. They also point to a Fourth Circuit case, which concluded the conditions of confinement for death row inmates flowed from the conviction and sentence. *Id.* at 19–20; *Prieto v. Clark*, 780 F.3d 245, 253 (4th Cir. 2014). However, as Plaintiffs point out, death row inmates "were not required to wear restraint[s] when they were sentenced to death and housed on death row," and death row "prison

11

conditions were similar to the prison conditions . . . in level four prisons." Ashby Mem. at 8–9. Plaintiffs' death row statuses had not changed, and their corresponding risk score had not changed; nonetheless, the prison implemented a policy that represented a significant departure from previous practice.

The Court now turns to the second requirement for qualified immunity, that a reasonable correctional officer would not have known his conduct violated the law. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001). "[I]f a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

Defendants cite two prior decisions to show that this Court had "found it was objectively reasonable for some of the same correctional officials named in this action to implement an even stricter restraint policy at Northern, albeit applied to a different group of inmates." Defs. Mem. at 25 (citing *Taylor v. Murphy*, No. 3:10-cv-245 (HBF), 2012 WL 4512510 (D. Conn. Sept. 30, 2012), *Lamont v. Murphy*, No. 3:10-cv-1364 (HBF), 2012 WL 4512565 (D. Conn. Sept. 30, 2012)). While it is true that the Court found that qualified immunity applied in these cases, the circumstances differed in three major respects: (1) inmates were designated as part of a high-risk program based on an *individualized* assessment, (2) the program was meant to be of *limited* duration, and (3) there was evidence the policy had received approval from the Attorney's General's office. *Taylor*, 2012 WL 4512510, at *1, *9, *12. The more suitable comparison is the aforementioned case of *Reynolds v. Murphy*, No. 3:13-cv-316 (SRU), 2015 WL 1456880 (D. Conn. Mar. 30, 2015), in which Judge Underhill discussed the exact policy in question here against Northern correctional officers. Although that ruling was limited to finding that Plaintiff had stated a plausible due process violation,

it highlighted the Court's concern about the duration of the out-of-cell restraint policy and disparity compared to the general population. *Id.* at *4.

While it may be "objectively reasonable for the defendants to believe that placing restraints on inmates sentenced to death, for the short periods of time they are moved between locations or for certain visits within their housing unit, or for times they are outside of their carefully controlled and monitored housing unit" would not constitute a due process violation, Defs. Mem. at 25, a reasonable correctional officer would have concluded at some point within the eight-year period that the out-of-cell restraint policy was unlawful, especially in the absence of any showing of a risk of safety posed by Plaintiffs. In fact, the prison's decision to return to a practice of using no restraints for out-of-cell movements on January 1, 2018, suggests Defendants did realize the policy could not go on indefinitely. *See* Declaration of Captain Robles, *Campbell v. Quiros*, No. 3:17-cv-946 (CSH), at *3 (D. Conn. May 11, 2018), ECF No. 28-1. It is not that Defendants could never have placed Plaintiffs in restraints; rather, it is that any rationale for such an indefinite policy surely expired long ago—something a reasonable officer should have realized. Defendants are not entitled to qualified immunity as it pertains to Plaintiffs' due process claims concerning the initial imposition of the out-of-cell restraint policy.

**C.      Due Process Claim as to Loss of Employment and Continued Denial of Employment**

Defendants argue that Plaintiffs cannot show they have a protected due process interest in "a specific work assignment." Defs. Mem. at 29. Furthermore, even if they did have a protected interest, qualified immunity shields them from liability. The Court is not convinced by Defendants' interpretation of the relevant state statute nor that qualified immunity applies. Plaintiffs may not have an interest in a specific work assignment, but Connecticut law seems to provide them an

interest in *some* work assignment.

1. **A Protected Interest**

"[T]he Constitution of the United States does not create a property or liberty interest in prison employment. Therefore, any such interest must be created by state law by language of an unmistakably mandatory character." *Richard v. Fischer*, 38 F. Supp. 3d 340, 352 (W.D.N.Y. 2014) (internal quotation marks omitted) (quoting *Ingram v. Papalia*, 804 F.2d 595, 596 (10th Cir. 1986) and collecting cases). See also *Johnson v. Rowley*, 569 F. 3d 40, 44 (2d Cir. 2009); *Bulger v. U.S. Bureau of Prisons*, 65 F.3d 48, 50 (5th Cir. 1995) (collecting federal appeals court cases); *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987) (finding no constitutional right to a job in the absence of underlying state law mandating jobs for prisoners); *Manley v. Bronson*, 657 F. Supp. 832 (D. Conn. 1987); *Banks v. Norton*, 346 F. Supp. 917, 921 (D. Conn. 1972) (noting that an inmate has no right to a particular job in a correctional institution); *Santiago v. Comm'r of Corr.*, 39 Conn. App. 674, 680 (Conn. App. Ct. 1995) (holding that inmates have "no property or liberty interest in prison employment"); State of Conn. Dep't of Corr. Admin. Directive 10.1(4)A (finding that "[n]o inmate shall have entitlement or a legitimate expectation to any work, programmatic or educational assignment or compensation therefor," with certain exceptions not here relevant).

"States may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Sandin v. Conner*, 515 U.S. 475, 483–84 (1995). Statutory or regulatory "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed" can create such a protected interest. *Hewitt v. Helms*, 459 U.S. 460, 471–72

(1983). Thus, two elements are required to establish a protected liberty interest[6] in prison employment, entitled to Due Process Clause protection: (1) a state statute or regulation, in "language of an unmistakably mandatory character"; and (2) evidence that the deprivation of employment, in violation of that statute or regulation, "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Hewitt*, 459 U.S. at 471; *Sandin*, 515 U.S. at 484.

First, Defendants disagree with Plaintiffs that Connecticut General Statute § 18-10a creates a protected interest in prison employment. The statute reads:

> The Commissioner of Correction shall provide for the employment and utilization of prisoners under sentence of death whose convictions are being appealed. Nothing in this section shall be construed so as to diminish security precautions for such prisoners, or to require conmingling with other prisoners, or to require daily employment.

Conn. Gen. Stat. § 18-10a. Defendants claim that the statute unambiguously only requires that "death row inmates be permitted some opportunity to be engaged in some activity other than sitting in their cells awaiting execution." Defs. Mem. at 29–30. They also assert that the legislative history supports their interpretation. *Id.* at 30–31.

A plain reading does not support Defendants' interpretation of the statute. The Court agrees with Plaintiffs that "shall provide" creates a constitutionally protected interest as per *Hewitt*. *See* Ashby Mem. at 27. Moreover, "employment" is usually associated with the payment of wages, not

---

[6] Prisoners' protected property interests are not subject to the additional scrutiny of *Sandin*, which dealt with liberty interests. *See Handberry v. Thompson*, 446 F. 3d 335, 353 n.6 (2d Cir. 2006). However, courts are in near universal agreement that prisoners have no protected interest in any particular job. *See, e.g. Johnson v. Rowley*, 569 F. 3d 40, 44 (2d Cir. 2009). *See generally* § 8:6 "The right to a particular job," 2 *Rights of Prisoners* § 8:6 (5th ed. 2017). Considering the specifics of Plaintiff's pleadings against that precedential backdrop, the Court finds that, if Plaintiff has any due process protected interest in prison employment, it is a liberty interest, and not a property interest.

merely providing someone with a "use" or "purpose," as Defendants assert. Two out of the four definitions for "employment" in Black's Law Dictionary mention payment in connection with having a "job" or "work," and the other two definitions are inapt or unhelpful.[7] As for the legislative history, Defendants have not provided sufficient context for the quotes they selected. For example, Defendants rely on Representative Harris's statement that the statute would allow death row inmates to have the privilege of exercising outside of their cells. *See* Defs. Mem. at 30–31. The Court cannot infer from these words, as Defendants do, that exercise was the *purpose* of the statute, only that exercise was a *benefit* of giving prisoners employment. In addition, it is not clear who Representative Harris is in relation to the legislative text; his words would be more authoritative as a bill sponsor, as opposed to someone who simply supports passage of the bill.

Defendants have not put forth a convincing interpretation of Connecticut General Statute § 18-10a. The plain meaning of the statute suggests that Plaintiffs had a protected interest in employment while on death row. Having been removed from their employment and given jobs where they "do nothing," Campbell Compl. ¶ 30, Plaintiffs have a plausible claim for relief here.

### 2. **Qualified Immunity**

Defendants argue that even if Connecticut General Statue § 18-10a requires the prison to provide employment to Plaintiffs, Defendants are entitled to qualified immunity. As explained *supra*, qualified immunity applies where a government official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

---

[7] Employment, *Black's Law Dictionary* (10th ed. 2014) (defining the term as "(1) The relationship between master and servant . . . . (2) The act of employing. (3) The quality, state, or condition of being employed; the condition of having a paying job. (4) Work for which one has been hired and is being paid by an employer.").

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citation omitted)). Defendants assert that a competent official could mistakenly interpret the statute, but that such a mistake would be reasonable.

This argument fails for two reasons. First, the statutory text does not support Defendants' interpretation. The plain language appears straightforward, to the extent that Defendants' suggestion on how the statute should be read seems unreasonably stretched. Second, it does not appear that Defendants' actions are in line with their supposedly reasonable but mistaken interpretation. Defendants argue that they believed they satisfied statute requirements because Plaintiffs were "given one hour of outdoor recreation time six days per week, and an additional hour of indoor recreation time six days per week." Defs. Mem. at 32–33. If this were so, then there would have been no need to replace Plaintiffs' Level Two jobs with Level One jobs in which they were paid to do "nothing." Campbell Compl. ¶ 30. Defendants could have simply just taken away Plaintiffs' jobs at the time, and according to their view, they would have been in compliance with Connecticut General Statute §18-10a. Instead, giving Plaintiffs a Level One job, with no discernable duties, supports a theory that Defendants also interpreted the statute to require them to provide Plaintiffs with employment and that they believed they could satisfy the statute by giving them "jobs" that were jobs only in name. Defendants have not shown that qualified immunity shields them from liability arising out of Plaintiffs' denial of employment.

### D. <u>Equal Protection Claim as to Lack of Employment on a Class-of-One Theory</u>

Defendants assert that case law bars class-of-one equal protection claims that concern public employment. Defs. Mem. at 34. Plaintiffs do not challenge Defendants' argument. Ashby Mem. at 31. Although no Second Circuit case has spoken on this exact issue, a review of the relevant case

17

law supports Defendants' position.

The Supreme Court in *Engquist v. Oregon Dept. of Agric.* held that "the class-of-one theory of equal protection has no application in the public employment context." 553 U.S. 591, 607 (2008). The "government has significantly greater leeway in its dealings with citizen employees than when it does when it brings it sovereign power to bear on citizens at large." *Id.* at 599. As an employer, the government does not raise equal protection concerns when it exercises the "broad discretion that typically characterizes the employer-employee relationship." *Id.* at 605.

The Second Circuit declined to extend *Engquist* in a case in which the New York State Department of Health allegedly subjected a clinical testing laboratory to unwarranted scrutiny, but it recognized that "there may be some circumstances where *Engquist* is properly applied outside the employment context." *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 142 (2d Cir. 2010). No other Second Circuit decision has inquired into the applicability of *Engquist* in other contexts. However, district courts in the Second Circuit and other circuits have done so, including in the prison context. *See*, *e.g.*, *Grady v. Bennett*, No. 16-cv-1270-JPG, 2017 WL 819676, at *3 (S.D. Ill. Mar. 2, 2017) ("[S]ituations involving this type of broad discretion [in removing inmate from his employment position] are exactly what the *Engquist* Court recognized were not covered by a 'class-of-one' claim."); *Weathers v. Hagemeister*, No. 1:13-cv-01932, 2015 WL 1956433 (E.D. Cal. Apr. 29, 2015) (rejecting class-of-one theory for inmate work assignment claims); *Johnson v. Pallito*, No. 2:12-cv-138, 2014 WL 2000369, at *2 (D. Vt. Apr. 21, 2014) (agreeing with correctional officials that *Engquist* controls and bars inmate-Plaintiff's job-termination claim); *Alexander v. Lopac*, No. 11 C 50012, at *2 (N.D. Ill. Mar. 3, 2011) ("Additionally, it would be anomalous to allow a prisoner to bring such a claim when corrections officers themselves cannot.").

18

The Court similarly finds that *Engquist* bars Plaintiffs' equal protection claims regarding prison employment. Although this Court followed Judge Meyer's decision in *Dehaney v. Chagnon* to find that Plaintiffs had a plausible claim based on a class-of-one theory in the initial review orders on Plaintiffs' complaints, *Dehaney* did not examine the effect of *Engquist* on a prisoner's equal protection claim. No. 3:17-cv-00308 (JAM), 2017 WL 2661624 (D. Conn. June 20, 2017); *see also Ashby v. Quiros*, No. 3:17-CV-916 (CSH), 2018 WL 2324081, at *7 (D. Conn. May 22, 2018); *Campbell v. Quiros*, No. 3:17-CV-946 (CSH), 2018 WL 888723, at *7 (D. Conn. Feb. 13, 2018). Accordingly, Plaintiffs' equal protection claims are dismissed.

### III. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss. Doc. 21. With respect to Plaintiffs' equal protection claim as to lack of employment on a class-of-one theory, Defendants' motion to dismiss is granted. As to Plaintiffs' due process claims regarding the initial imposition of the out-of-cell restraint policy and denial of employment, Defendants' motion is denied. Accordingly, both due process claims may proceed.

It is SO ORDERED.

Signed: New Haven, Connecticut
December 20, 2018

/s/ Charles S. Haight, Jr.
CHARLES S. HAIGHT, JR.
Senior United States District Judge