LAZALE ASHBY &
JESSE CAMPBELL, III,

            Plaintiffs,

v.

ANGEL QUIROS, ET AL.,

            Defendants.

Civil Action No.
17 Civ. 916 (CSH)

**MARCH 10, 2020**

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge:**

*Pro se* Plaintiffs Lazale Ashby and Jesse Campbell are death row inmates at the Connecticut Northern Correctional Institution ("Northern"). Their complaints in this consolidated action assert constitutional due process claims arising out of the conditions of their confinement. Defendants are officers of the Connecticut Department of Correction ("DOC") or prison administrators at Northern.

In a prior opinion, familiarity with which is assumed, the Court denied Defendants' motion to dismiss Plaintiffs' due process claims. *See Ashby v. Quiros*, No. 17 Civ. 916 (CSH), 2018 WL 6704744 (D. Conn. Dec. 20, 2018) ("*Ashby I*"). Discovery then ensued.

Defendants now move for summary judgment on the due process claims. Doc. 43 ("Mot. for Summ. Judg."). They support that motion with evidence produced during discovery or otherwise submitted for the first time in the litigation. Mot. for Summ. Judg. exs. 1–26. Plaintiffs resist Defendants' motion for summary judgment. Doc. 46 ("Defs.' Mem."). This Ruling resolves that motion.

# I.   BACKGROUND

The following facts are derived from the Parties' submissions pursuant to Local Rule 56(a) and the affidavits and exhibits attached thereto. *See* Doc. 43-28 ("Defs.' Statement of Material Facts in Supp. of Mot." or "Defs.' 56(a)"); Doc. 46-2, at 23–67 ("Pls.' Resp. To Defs.' 56(a)" or "Pls.' 56(a)"). Unless otherwise noted, the facts recounted below are undisputed or indisputable.

Plaintiffs Ashby and Campbell are death row inmates at Northern, a maximum-security prison for adult males operated by DOC. Defs.' 56(a) ¶ 1. Both Plaintiffs were convicted for murder. Campbell was sentenced to death in 2007; Ashby in 2008. *Id.* ¶¶ 20 –21.[1]

Following an altercation on March 29, 2010, between a corrections officer and another inmate on death row, then-DOC Commissioner Brian Murphy directed a full review of the management of death row inmates. *Id.* ¶ 31.[2] The review and subsequent policy decisions impacted Plaintiffs in two ways.

First, Plaintiffs were placed in restraints whenever they left their cells. According to a new "Death Row Restraint Policy Recommendation" memorandum issued on April 5, 2010, by Northern's Warden, Defendant Angel Quiros, all death row inmates would now be:

---

[1]   The Connecticut legislature passed Conn. Gen. Stat. Ann. § 18-10b in 2012, which prospectively banned the death penalty. *See State v. Santiago*, 318 Conn. 1, 122 A.3d 1, 9, 86 (2015). In 2015, the Connecticut Supreme Court abolished the death penalty for all prisoners. *See id.* Based on these legal developments, those who are on "death row" no longer face execution. However, this Ruling will refer to Plaintiffs as prisoners on "death row," which is consistent with the terminology in their submissions.

[2]   The incident was not the first of its kind. In the years preceding the incident, there were a number of altercations between Northern inmates and corrections officers—including ten serious staff assaults—"[m]any of [them] . . . occurred during times when inmates were in transit between their secure locations, such as their cell and the dayroom." Defs.' 56(a) ¶¶ 24, 32. For example, on one occasion, a Northern corrections officer was nearly killed when his throat was sliced by an inmate who had hidden a razor blade, nearly severing the officer's artery. *Id.* ¶ 32.

- *Handcuffed behind their back for routine out-of-cell movement*: an inmate would be placed in handcuffs prior to exiting his cell; an officer would escort him to the showers, recreation yard, dayrooms, or social visits; the restraints were removed when the inmate was secured in the area; and the process was reversed upon the inmate's return to his cell.

- *Placed in full restraints in front for professional visits*: an inmate would be placed in handcuffs, leg-irons, and a tether chain for visits with attorneys, legal calls, medical and mental health appointments, and other visits which required correctional staff to be present in a particular area with an inmate. The restraints would remain on at all times until an inmate returned to his cell.

- *Placed in full restraints behind the back for out-of-unit movement within Northern*: an inmate would be placed in handcuffs, leg-irons, and a tether chain in the back, except when a medical or dental procedure required otherwise.

Doc. 43-3, at 25 ("Quiros Decl."). The stated goal of the policy was to "enhance staff safety and security when interacting with death row inmates." *Id.* It was approved by Commissioner Murphy in May 2010 and codified in Administrative Directive 9.4 in July 2010 (the "restraint policy"). Defs.' 56(a) ¶ 33. To accommodate the policy, DOC officials installed small handcuff traps in the doors at Northern so staff could remove the restraints when an inmate had been escorted and secured at a particular destination, such as a unit dayroom. *Id.* ¶ 34.

The Parties dispute the exact amount of time each day during which Plaintiffs were restrained. Defendants conducted a series of timed restraint movements at Northern in order to determine how long an inmate would remain in restraints if he were placed in restraints for movement from one secured location to another. Doc. 43-5 ¶ 2 ("Eshou Decl."). The tests revealed that the duration required to apply handcuffs on an inmate behind his back through a cell trap door, remove him from his cell, escort him to a unit outdoor recreation enclosure, secure him in the outdoor enclosure, and remove his handcuffs was two minutes and one second. *Id.* ¶ 5. In a typical day, if an inmate traveled to outdoor recreation and took a shower, he would have been involved in

"restraint application" for approximately five minutes and forty-two seconds. Defs.' 56(a), at 62. Plaintiff Ashby, on the other hand, contends that the restraints were on for "longer than a minute or two depending on staffing, the location of an inmate's cell, and whether other inmates were out on the tier." Doc. 46, at 47 ¶ 83 ("Ashby Decl."). Similarly, Plaintiff Campbell claims that he was subject to a daily minimum of ten minutes in handcuffs stemming from the restraint policy. Doc. 46, at 30 ¶ 36 ("Campbell Decl."). Regardless of the amount of time that Plaintiffs were restrained under the policy, it is undisputed that following the implementation of the policy, security-related incidents and assaults decreased on death row. Defs.' 56(a) ¶ 49.

The restraint policy remained materially unchanged for several years until Connecticut abolished the death penalty. *See supra* n.1. Thereafter, DOC's Commissioner at the time, Defendant Scott Semple, directed his staff to conduct a review to determine how the agency would implement section 18-10b, which mandated that death row inmates be resentenced to life imprisonment without release. Defs.' 56(a) ¶ 54.

As a result of the review, in June 2016, DOC revised Administrative Directive 9.4—which also contained the restraint policy—to provide for a new "Special Circumstances Status." *Id.* ¶ 57. This status was conferred upon death row inmates who were resentenced to life imprisonment without the possibility of release, per section 18-10b. *Id.* And, notable for Plaintiffs, any inmates who were resentenced would no longer be subject to the restraint policy as a matter of course (though they would still undergo a risk assessment to determine if any restrictions, such as out-of-cell restraints, were necessary for security reasons). *Id.* ¶ 58.

Meanwhile, in July 2016, DOC began gradually revising the restraint policy itself for all death row inmates who had not been resentenced. *Id.* ¶ 60. Over the course of two years, the policy

became less restrictive, until January 2018, when it was ended altogether, except for out-of-facility travel (such as inmates' court proceedings). *Id.*

Plaintiffs' claim regarding the restraint policy therefore focuses on the approximately eight-year period, from March 2010 to January 2018, when the policy was in effect. Over this period, according to Plaintiffs, no notice was provided to Plaintiffs regarding the new policy, no hearing was held, and no process was permitted during this period for Plaintiffs to challenge the policy. Pls.' 56(a), at 60 ¶ 14. Nor were there any individual assessments or periodic reviews of Plaintiffs' status throughout this time period. *Id.* at 62 ¶ 22.

Secondly, the restraint policy had an additional consequential effect for Plaintiffs: their prison employment duties changed. Prior to March 2010, Plaintiffs were tiermen—or janitors—who swept and mopped the floor of Northern's One East Unit. *Id.* at 58 ¶ 1. When Defendants implemented the restraint policy in March 2010—and Plaintiffs were restrained when they were outside of their cells—Plaintiffs' duties not surprisingly changed to accommodate their new circumstances. *Id.* at 59 ¶ 7. They were no longer able to carry out their tierman duties because the restraints prevented them from sweeping and mopping. *Id.* at 59 ¶ 8. Under the restraint policy, Plaintiffs instead were paid to clean their cells, the showers, and the day rooms. *Id.* at 59 ¶ 9.[3] Plaintiffs had never been

---

[3] The Parties dispute Plaintiffs' job "tier" classification and the wages that Plaintiffs were paid. Plaintiffs claim that prior to the restraint policy, they were paid at a "tier two" level, earning $1.25 per day. Pls.' 56(a), at 63 ¶ 30. Afterward, Plaintiffs claim that they were demoted to a "tier one" level, earning $0.75 per day. *Id.* However, documentation submitted by Defendants—specifically, records of Plaintiffs' incoming funds—reveal that Plaintiffs were not actually paid at a "level two" rate. *See* Doc. 47-1 ¶¶ 3–4 ("Gresh Decl."). In other words, the restraint policy did not result in a change in Plaintiffs' status or pay. Plaintiffs' contention seems to principally rely on a Local Rule 56(a)(1) Statement filed in another case, *Webb v. Arnone*, 13 Civ. 199 (MPS). Pls.' 56(a), at 63 ¶ 30. But Counsel for Defendants in the instant case, who also filed the Local Rule 56(a)(1) Statement in *Webb*, explained that the *Webb* submission was based on an "innocent error" in one of the affidavits, which mistakenly stated that death row inmates were at one time being paid $1.25 per day to work as janitors. Doc. 47, at 4–5 ("Defs.' Reply"). The Court is

5

paid to clean their own cells in the past.  Ashby Decl. at 45 ¶ 71.

Plaintiffs claim that these new responsibilities violate Connecticut law, which they claim required DOC to provide death row prisoners with "employment."  According to Plaintiffs, they were provided "undefined responsibilities"; and though they were paid, they did not actually do any work.  *Id*. at 51 ¶ 104.

## II.  <u>STANDARD OF REVIEW</u>

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *see also Redd v. New York Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law."  *Id*.

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact.  *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986).  If the initial burden is satisfied, the burden then shifts to the nonmoving party to present "specific evidence demonstrating the existence of a genuine dispute of material fact."  *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks and citation omitted).  While the Court must view the record in the light most favorable to the nonmoving party, and resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, *see Anderson*, 477 U.S. at 255, the nonmoving party nevertheless "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio*

---

satisfied with this explanation, which is supported by documentation; and concludes that it is undisputed that Plaintiffs' wage of $0.75 per day did not change as a result of the restraint policy.

*Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must support each assertion disputing the veracity of a fact or existence of an alleged dispute with specific citation to the evidentiary record. *See* Fed. R. Civ. P. 56(c)(1).

Because Plaintiffs are proceeding *pro se*, the Court must read their submissions "liberally" and interpret them "to raise the strongest arguments" that they suggest. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). Nonetheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (internal quotation marks omitted).

## III.   DISCUSSION

Plaintiffs' Complaint asserts two constitutional claims based upon alleged violations of the Due Process Clause. The first claim arises out of the impact upon Plaintiffs of the out-of-cell restraint policy imposed by the prison administrators at Northern. The second claim complains about the loss of Plaintiffs' prison jobs and continued unemployment, also as a result of the restraint policy. Defendants move for summary judgment on both claims. The Court will discuss the claims in order.

### A.   Due Process Claim as to the Imposition of the Out-of-Cell Restraint Policy

Plaintiffs argue that they were denied due process in connection with Northern's restraint policy. Defendants argue principally that they are entitled to qualified immunity from liability for any constitutional claim triggered by the restraint policy.

#### 1.   *Preliminary Considerations*

This is not the first time the parties have debated these issues. At an earlier stage in the litigation, Defendants moved to dismiss Plaintiffs' Complaint. That motion was made under Fed.

R. Civ P. 12(b)(6), which looks to the well-pleaded allegations of the complaint, and asks whether they sufficiently allege a viable claim against Defendants under the governing law. Defendants moved *inter alia* to dismiss Plaintiffs' restraint policy claim as barred by qualified immunity.

The Court decided Defendants' motion to dismiss in *Ashby I*, the opinion filed on December 20, 2018. *Ashby I* rejected Defendants' invocation of qualified immunity with respect to the restraint policy as the basis for a Rule 12(b)(6) dismissal of the Complaint. *See Ashby I*, 2018 WL 6704744, at *7.

Defendants revive these issues in their present motion for summary judgment under Rule 56. Defendants re-assert their contention that qualified immunity precludes due process claims based on the out-of-cell restraint policy. Unlike a motion to dismiss under Rule 12(b)(6), a Rule 56 summary judgment motion is not limited to the pleadings. *See In re Bennett Funding Grp., Inc.*, 336 F.3d 94, 99 (2d Cir. 2003) ("In deciding that summary judgment is appropriate, the Court must determine that there is no genuine issue of material fact, taking the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits."). Defendants' submissions include twenty-six affidavits or other documents prepared by prison administrators, officers, and individuals familiar with the facts. Mot. for Summ. Judg. exs. 1–26. These materials create a considerable evidentiary record which did not exist when the Court rejected qualified immunity in deciding the earlier motion to dismiss.

In addition, following the Court's decision in *Ashby I*, the Supreme Court and Second Circuit have filed opinions construing the qualified immunity doctrine—specifically, *City of Escondido, California v. Emmons*, 139 S. Ct. 500 (2019); *Cugini v. City of New York*, 941 F.3d 604 (2d Cir. Oct. 25, 2019); and *Francis v. Fiacco*, 942 F.3d 126 (2d Cir. Nov. 12, 2019). Those opinions provide

8

the Court with binding instruction regarding the boundaries and application of qualified immunity.

Given this expansion of the factual record, and the effect of these recent appellate cases, decided post-*Ashby I*, the Court reconsiders its holding in *Ashby I* on qualified immunity as a bar to liability on claims involving the restraint policy revealed by the evidence.

### 2. The Standard of Review in the Qualified Immunity Analysis

When public officials invoke qualified immunity at the summary judgment stage, courts must consider: "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Cugini*, 941 F.3d at 611. To determine whether a right is clearly established, courts consider "Supreme Court decisions . . . [Second Circuit] decisions, and decisions from other circuit courts." *Simon v. City of New York*, 893 F.3d 83, 92 (2d Cir. 2018).

Courts have discretion to determine which prong of the analysis to address first. *See Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court held that the initial inquiry *must* be whether "the facts alleged show the officer's conduct violated a constitutional right," and only after this step could a court determine "whether the right was clearly established." *Id.* at 201. In *Pearson v. Callahan*, 555 U.S. 223 (2009), however, the Supreme Court receded from this approach, having concluded that "the judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case." *Id.* at 242. Here, the Court will address them consecutively because the case will "promote[] the development of constitutional precedent" and it involves "questions that do not frequently arise in cases in which a qualified immunity defense

9

is unavailable." *Id.* at 236.[4]  Accordingly, the Court first asks whether, taking the facts in the light most favorable to Plaintiffs, they have sufficiently established a constitutional claim of a due process violation.

### 3.  *Plaintiffs' Liberty Interest in Freedom from Restraint*

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court held that in the prison setting, liberty interests protected by due process are "limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 486.  In the *Sandin* court's view, the plaintiff's condition of confinement—thirty days in disciplinary segregation—did not present the type of "atypical and significant" deprivation that would implicate a liberty interest.  *See id.* at 485–86.  Accordingly, the plaintiff was not entitled to procedural due process prior to his placement in punitive segregation.  *See id.* at 487.

More recently, the Second Circuit held that the factors relevant to determining whether an inmate endured an "atypical and significant hardship" include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary confinement."  *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009).

This Court has previously applied these principles in the context of out-of-cell restraints.  In

---

[4]  In *Ashby I*, the Court concluded that it would not extensively explore the question of whether a constitutional right was violated by the imposition of the restraint policy and instead focus on whether the imposition violated clearly established law because the inquiry would have "no precedential value" and "would not meaningfully develop constitutional precedence" because Connecticut phased out its class of death row prisoners. *Ashby*, 2018 WL 6704744, at *4.  On the present, fuller record, however, it has become clear that DOC implemented variations of the restraint policy for other populations of inmates—*e.g.*, Security Risk Group Threat Members and Administrative Segregation Phase One inmates. Defs.' 56(a) ¶¶ 27–28.  Therefore, the Court's inquiry into whether Plaintiffs' constitutional right was violated by the restraint policy may have precedential value.

*Reynolds v. Murphy*, No. 13 Civ. 316 (SRU), 2015 WL 1456880 (D. Conn. Mar. 30, 2015), Judge Underhill concluded that a death row inmate "stated a plausible claim that he possessed a liberty interest in being free of out-of-cell restraints and the defendants failed to provide him with procedural due process in connection with his placement on this restraint status." *Id.* at *4. Judge Underhill reasoned that the plaintiff stated such a claim, "[g]iven the duration of the plaintiff's placement on restraint status and the fact that the plaintiff alleges that inmates . . . who are not on death row, are permitted to move outside of their cells without being handcuffed or shackled." *Id.* (citations omitted).

Although *Reynolds* decided a motion to dismiss—and the motion in the case at bar is for summary judgment—*Reynolds* is nonetheless relevant with respect to the existence *vel non* of Plaintiffs' liberty interests. As in *Reynolds*, Plaintiffs at bar were subject to the restraint policy for a prolonged duration: it is undisputed that Plaintiffs were subject to the out-of-cell restraint policy for nearly eight years. This lengthy duration is further exacerbated by the duration and frequency of deprivations, which are "highly relevant to whether the conditions of a plaintiff's confinement should be considered atypical." *Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999). Plaintiffs would have been handcuffed to and from the showers every day, *see* Defs.' 56(a) ¶ 75, for example, as well as to and from recreation every day, *see* Defs.' Mem. at 62. Plaintiffs would be restrained again on days when they visited with attorneys, and attended medical and mental health appointments; and again if they participated in any other out-of-cell activities. Quiros Decl. at 25.

Northern's restraint policy also implicates a liberty interest because of its relationship to the ordinary incidents of prison life. "Whether the conditions of . . . confinement constitute an atypical and significant hardship requires that they be considered in comparison to the hardships endured by

11

prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Welch*, 196 F.3d at 393. In the instant case, Northern inmates who were not on death row (*i.e.*, the general population) were permitted to move outside of their cells without being handcuffed or shackled. Pls.' Mem. at 15. Similarly, inmates in other restrictive housing units similarly were not subject to the restraint policy. *Id.* This factor militates in favor of the conclusion that Plaintiffs possessed a liberty interest in being free of out-of-cell restraints and that Defendants failed to provide them with procedural due process in connection with their placement on this restraint status.

Defendants contend that Plaintiffs did not experience a "significant" hardship because the daily duration of the restraint—approximately one to five minutes per day—was *de minimis*. Defs.' Mem. at 63. Plaintiffs dispute this estimate, as an initial matter, claiming that they were restrained for at least ten minutes per day. Campbell Decl. at 30 ¶ 36. In any event, Defendants fail to cite to any case law in support of their argument. On the contrary, even if Plaintiffs were subject to the restraint policy for only minutes at a time—which the Court is not yet prepared to conclude because of its duty to take the facts in the light most favorable to Plaintiffs—the Second Circuit has observed that "especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004); *see also Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical.").

In the case at bar, Plaintiffs possessed a liberty interest in being free from restraints while they moved between locations at Northern. Defendants failed to afford Plaintiffs due process in

connection with the restraint policy.[5] Defendants' violation of the Due Process Clause in that regard, however, is not determinative of the qualified immunity issue, which the Court addresses below. It simply sets the stage for a determination of the applicability of the qualified immunity doctrine to the particular conduct challenged by Plaintiffs.

### 4. *Defendants' Entitlement to Qualified Immunity*

As noted *supra*, the opinion in *Ashby I* rejected Defendants' invocation of qualified immunity with respect to the restraint policy as the basis for a Rule 12(b)(6) dismissal of Plaintiffs' Complaint. *See Ashby*, 2018 WL 6704744, at *7. Defendants revive these issues in their present motion for summary judgment under Rule 56. Prior to turning to Defendants' renewed arguments, the Court will summarize the Supreme Court and Second Circuit's recent opinions construing the qualified immunity doctrine—opinions that were filed subsequent to *Ashby I.*

The Second Circuit in *Francis*, 942 F.3d at 145, that court's most recent opinion addressing qualified immunity, summarized the doctrine:

> The Supreme Court has lately emphasized the breadth of qualified immunity protection. While the Court does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. That precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Moreover, the Supreme Court has repeatedly told courts . . . not to define clearly established law at a high level of generality, instead emphasizing that clearly established law must be particularized' to the facts of the case. In short, qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions and protects all but the plainly incompetent or those who knowingly violate the law.

---

[5] Plaintiffs did not receive any notice or hearing in connection with the restraint policy. Pls.' Mem. at 36. There was no process pursuant to which Plaintiffs could challenge the policy. *Id.* And, all of Plaintiffs' verbal and written requests to remedy the policy were denied. *Id.*

*Francis*, 942 F.3d at 145–46 (citations and internal quotation marks omitted).

In *Francis*, the Second Circuit also cited to *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011), a case in which the Supreme Court held that the Attorney General did not violate established law and was accordingly entitled to qualified immunity with respect to an individual's interrogation and detention for suspected terrorist activities. In arriving at that conclusion, the Supreme Court reiterated that it had:

> [R]epeatedly told courts . . . not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.

*Ashcroft*, 563 U.S. at 742.

The Supreme Court applied that principle—that is, that courts ought not to define "clearly established law" at a high level of generality—more recently in *City of Escondido*, where the court reversed the Ninth Circuit's grant of qualified immunity to police officers on claims of excessive force. The court said disapprovingly that the "Ninth Circuit's entire relevant analysis of the qualified immunity question consisted of the following: '[t]he right to be free of excessive force was clearly established at the time of the events in question.'" *City of Escondido*, 139 S. Ct. at 502. The court then articulated why that analysis of the qualified immunity question was deficient:

> An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. . . . The Court of Appeals should have asked whether clearly established law prohibited the officers from stopping and taking down a man in these circumstances. Instead, the Court of Appeals defined the clearly established right at a high level of generality by saying only that the "right to be free of excessive force" was clearly established. With the right defined at that high level of

14

> generality, the Court of Appeals then denied qualified immunity to
> the officers and remanded the case for trial. . . . The Court of Appeals
> failed to properly analyze whether clearly established law barred
> Officer Craig from stopping and taking down Marty Emmons in this
> manner as Emmons exited the apartment. Therefore, we remand the
> case for the Court of Appeals to conduct the analysis required by our
> precedents with respect to whether Officer Craig is entitled to
> qualified immunity.

*Id.* at 503–04 (citations and internal quotation marks omitted).

In *Cugini* and, then in *Francis*, the Second Circuit followed these Supreme Court qualified immunity decisions in focusing upon whether the *particulars* of an officer's conduct violated a *generally* stated right.

*Cugini*, for example, involved a claim of excessive force against a police officer who handcuffed the plaintiff and disregarded her cries that the tightened cuffs were hurting her. The district court ruled that the defendant officer was entitled to qualified immunity. While the Second Circuit held that "an officer's use of excessive force during handcuffing could give rise to a Fourth Amendment claim for excessive force," the issue in the case was the officer's qualified immunity from liability for that claim. *Cugini*, 941 F.3d at 616. The Second Circuit added that, "we cannot rest our ultimate conclusion as to immunity on a right that was clearly established only at a high level of generality." *Id.* (citation and internal quotation marks omitted). Rather, the court of appeals reasoned that it must:

> [F]ocus more narrowly on whether, at the time of Cugini's arrest,
> clearly established law required an officer to respond to a complaint
> by a person under arrest where, as here, that person exhibited only
> non-verbal aural and physical manifestations of her discomfort.

*Id.* The officer was entitled to qualified immunity because of the way the Second Circuit answered that question:

We conclude that at the time of the plaintiff's arrest, there was no such clearly established law. It remained an open question in this Circuit whether a plaintiff asserting an excessive force claim was required to show evidence that an officer was made reasonably aware of her pain by means of an explicit verbal complaint. . . .

Before today, then, the law at least left room for reasonable debate as to whether the plaintiff was required to alert the defendant to her pain, and, if so, whether her non-verbal behavior was sufficient to do so. . . . [A] reasonable officer under these circumstances could have concluded *at the time of her arrest* that he was not required to respond to her non-verbal indications of discomfort and pain. We therefore conclude that the plaintiff has failed to establish that the defendant violated a clearly established constitutional right.

*Id.* at 616–17 (emphasis in original; citations omitted).[6]

In *Francis*, another recent Second Circuit case (as noted above), the plaintiff was wrongfully required to serve four months in a state prison after completing a federal sentence for a different crime because the defendant state officials had not implemented a state court's directive that the sentences should run concurrently. *See Francis*, 942 F.3d at 131. *Francis* resembles *Cugini* in that in each case, the Second Circuit identified a violation by defendant of a plaintiff's constitutional right, but held that the defendant was entitled to qualified immunity from liability for that conduct.

The state defendants in *Francis* "violated the Due Process Clause by implementing Francis's sentence in the manner they did without providing adequate notice to the state sentencing court and the attorneys present at Francis's state sentencing" but the defendants were nevertheless "entitled to qualified immunity from all of Francis's constitutional claims under the circumstances of the case."

_____

[6] It is worth noting that the Second Circuit disapproved of the arresting officer's conduct in *Cugini*, and ended its opinion with the declaration that "officers can no longer claim . . . that they are immune from liability" for using force "that they should know is unreasonable based on the arrestee's manifestation of signs of distress on the grounds that the law is not clearly established." *Cugini*, 941 F.3d at 617. That is to say, in the Second Circuit, at least, police conduct, which did not violate a "clearly established" constitutional right when *Cugini* was argued in the court of appeals, became a constitutional violation on the day the Second Circuit filed its opinion.

*Id.* at 131–32.

The Second Circuit embarked upon the familiar two-pronged inquiry in *Francis*, noting that qualified immunity defeats a federal claim "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 145 (citations and internal quotation marks omitted). The *Francis* plaintiff failed to defeat qualified immunity because he did not establish the second element, a rationale revealed by the Second Circuit's analysis of the case:

> We held that the Due Process Clause required the State Defendants to notify the sentencing court, as well as the attorneys for both parties at sentencing, prior to implementing Francis's sentence in a manner that deviated from the sentencing court's original pronouncement. We now consider whether Mathews and its progeny had "clearly established" those constitutional requirements at the time when the State Defendants engaged in the course of conduct at issue here.

*Id.* at 149. The court of appeals then concluded that, "[w]ith respect to this case in particular, precedent had not clearly established the due process requirements we identified above at the time of the State Defendants' conduct." *Id.* That conclusion depended, *inter alia*, upon the Second Circuit's observation that "no case of which we are aware has even hinted that the Constitution might require the specific procedural protections we have now prescribed." *Id.* It therefore followed that qualified immunity barred the plaintiff's claims, because although the court "identif[ied] a constitutional violation pursuant to such an analysis," it nonetheless "conclude[d] that qualified immunity protect[ed] the State Defendants from damages liability under the circumstances of th[e] particular case." *Id.*

With this guidance from the Supreme Court and Second Circuit in mind, the Court now reverts to its holding on qualified immunity in *Ashby I*. It is worth reiterating that *Ashby I* considered

Defendants' qualified immunity in the context of Defendants' motion on the pleadings to dismiss Plaintiffs' Complaint. This Ruling considers qualified immunity in the quite different context of Defendants' motion for summary judgment, and on a subsequently developed evidentiary record.

*Ashby I* noted that these Plaintiffs were subjected to the prison's out-of-cell restraint policy from the imposition of the policy on death row inmates in March 2010 until January 2018. Plaintiffs contend that their subjection to so prolonged a policy of strict out-of-cell restraint gave rise to plausible due process claims. The Court held in *Ashby I* that Campbell and Ashby "possessed a liberty interest in being free of out-of-cell restraints"; "a lengthy deprivation of a liberty interest without procedural protections is in violation of the Due Process Clause"; and that while the law may allow prison administrators to restrain inmates when being transported between secure locations "for some period of time, the law is clear that eight years of this practice is much too long." *Ashby*, 2018 WL 6704744, at *5 (citations omitted). From that proposition, the opinion in *Ashby I* reasoned that qualified immunity was not available because "a reasonable correctional officer would have concluded at some point that the out-of-cell restraint policy was unlawful, especially in the absence of a risk of safety posed by the Plaintiffs." *Id*. at *7.

The Defendants at bar undertook to cure that absence of proof of risk by submitting, in support of their motion for summary judgment, a number of sworn declarations by prison administrators, which are cited and quoted in Defendants' Local Rule 56(a)(1) Statement. *See* Mot. for Summ. Judg. exs. 1–8; Defs.' 56(a). The following paragraphs are derived from those declarations.

At all pertinent times, Northern was and remains Connecticut's maximum security facility for adult males. The entire facility is composed of Restrictive Housing Units ("RHUs") which, in

2009, housed offenders assigned to administrative segregation for chronic discipline, inmates sentenced to death, and security risk group (gang or "SRG") inmates. In the judgment of prison administrators, inmates sentenced to death posed unique concerns for correctional management. Many of them had demonstrated proclivities for violence or committed horrendous acts. In addition, inmates facing a death penalty had less incentive to conform to institutional rules, and disciplinary sanctions often had less impact upon them. The declarants do not put it quite that way, but the sense one gets is that, in the prison administrators' view, a death row inmate is problematic because he feels he has nothing to lose. When the legislature banned the death penalty in 2012, *see supra* n.1, inmates sentenced to death were resentenced to a "special circumstances high security" designation, and those concerns remained.

In the fall of 2009, as the result of a number of violent incidents instigated by inmates, the Northern administrators and the Commissioner of DOC promulgated policy changes regarding the restraint status of inmates at the facility. In April 2010, that process produced the out-of-cell restraint practices and procedures for death row inmates which Plaintiffs challenge in this action. The prison administrators defend that restraint policy as "reasonable, appropriate and sound correctional practice in light of the escalating violence and security related incidents occurring prior to 2010." Doc. 43-1 ¶ 32 ("Hartnett Decl."). These forms of restraint were intended to prevent or minimize planned or spontaneous acts of violence by potentially dangerous inmates, thereby enhancing the safety of other inmates and prison staff.[7]

Having considered the case anew, in the light of an expanded evidentiary record, more recent

---

[7] These two paragraphs of text are based principally upon the declarations of Captain Robert Hartnett, *see* Hartnett Decl.; psychologist Mark Frayne, *see* Doc. 43-2 ("Frayne Decl."); and Angel Quiros, former Warden of Northern, *see* Quiros Decl.

appellate authority, and the recasting of Defendants' dispositive motion, the Court finds it necessary to revisit the holding in *Ashby I* on the issue of qualified immunity as a defense to Plaintiffs' claims for unconstitutional restraint.

This Court's opinion in *Ashby I* defined the rights at issue at a high level of generality. "As for the first requirement for qualified immunity," *Ashby I* explained, "the law clearly establishes that a lengthy deprivation of a liberty interest without procedural protections is a violation pf the Due Process clause." *Ashby*, 2018 WL 6704744, at *5. *Ashcroft v. al-Kidd* teaches, though, that this sort of "general proposition . . . is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft*, 563 U.S. at 742. On that second requirement for qualified immunity, moreover, *Ashby I* contented itself with saying that "the law is clear that eight years of this practice is much too long," since "a reasonable correctional officer would have concluded at some point within the eight-year period that the out-of-cell restraint policy was unlawful, especially in the absence of any showing of a risk of safety posed by Plaintiffs." *Ashby*, 2018 WL 6704744, at *5, *7.

That generalized and conclusory analysis may be forgiven on a motion to dismiss limited to the pleadings, but it cannot be defended under *City of Escondido*, *Cugini*, and *Francis*, which hold that the "clearly established" element of qualified immunity "must be particularized to the facts of the case," an exercise that the earlier motion on the pleadings did not freely allow. *Francis*, 942 F.3d at 146. The Defendants at bar now seek to furnish that particularization in the form of declarations of prison administrators in support of the present motion for summary judgment. The Court is bound to consider those declarations in a reconsideration of the qualified immunity issue. *See In re Bennett*, 336 F.3d at 99.

In their declarations, the administrators at Northern present themselves as having to deal with a sub-group of inmates previously sentenced to death; and, the death sentence having been eliminated, thereafter confined under a policy of restraints which the administrators believed enhanced security and safety in the facility. The administrators describe in their declarations the risks and problems they perceived to be inherent in the status of these inmates and the circumstances of their confinement. The out-of-cell restraint practices of which Plaintiffs complain are the distillation of the Defendants' exercise of discretion in dealing with those risks and problems. These are the particulars which give rise to the restraint policy at issue in this case.

This Court expresses no opinion on whether the Defendants' restraint policy for this group of inmates struck a proper balance between the inmates' liberty interest and the administrators' responsibility for prison security and safety. The decision on the qualified immunity issue does not depend upon any view the Court may have on the merits of the policy (and the Court has none). Judicial evaluation of the wisdom, even the legality, of public officers' conduct is not determinative of the officers' entitlement to qualified immunity from liability for that conduct. Indeed, "[t]he availability of qualified immunity does not turn on whether the defendants violated the plaintiff's rights; qualified immunity is a *defense*." *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995) (emphasis in original). That is because, in part, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions and protects all but the plainly incompetent or those who knowingly violate the law." *Francis*, 942 F.3d at 146.

The functioning of that principle is illustrated by the Second Circuit's decision in *Lennon*, where the plaintiff claimed a wrongful arrest. The court observed that, "even if the plaintiff's federal rights were clearly established at the time of the alleged violation, the defendants may nevertheless

enjoy qualified immunity if it was objectively reasonable for them to believe that their actions did not violate those rights." *Lennon*, 66 F.3d at 423. Having posed the question thus, the Second Circuit answered it favor of the defendants:

> Perhaps a rational jury could find that the officers lacked probable cause and should not have arrested Mrs. Lennon; however, in our view, a rational jury could *not* find that the officers' judgment was so flawed that no reasonable officer would have made a similar choice. The defendants are entitled to summary judgment on this claim.

*Id.* at 424–25 (emphasis in original).

Applying this rationale to the case at bar, the question on qualified immunity therefore becomes whether it was objectively reasonable for the Northern prison administrators to believe that the out-of-cell restraint policy for these particular inmates did not violate the inmates' liberty interests. There does not appear to be any appellate opinion directly on point, a circumstance that is significant if not determinative. *See Francis*, 942 F.3d at 145 ("While the Court does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. That precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.").

In *Reynolds*, a case in which, as noted above, this Court considered Northern's restraint policy, Judge Underhill concluded on similar facts that a death row inmate "ha[d] stated a plausible claim that he possessed a liberty interest in being free of out-of-cell restraints." *Reynolds*, 2015 WL 1456880, at *4. *Reynolds*, however, only addressed whether the plaintiff's claims would survive a motion to dismiss; the Court did not evaluate whether the defendants had violated "clearly established" law in connection with a qualified immunity defense. Defs.' Mem. at 51. Moreover, Judge Underhill, the author of the *Reynolds* opinion, is a district judge; and "district court decisions

do not 'count' as 'clearly established' law for qualified immunity purposes." *Tuttle v. Semple*, No. 17 Civ. 2037 (JAM), 2018 WL 2088010, at *5 n.2 (D. Conn. May 4, 2018) (quoting *Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir. 2006)). This Court's decision in *Reynolds* does not support the proposition that the Defendant prison administrators are not entitled to qualified immunity because they knew their restraint policy violated a constitutional liberty interest right of Plaintiffs to be free from restraints during routine movements of short duration within the prison.

Plaintiffs at bar also rely upon *Benjamin v. Kerik*, 102 F. Supp. 2d 157 (S.D.N.Y. 2000), *aff'd sub nom. Benjamin v. Fraser*, 264 F.3d 175 (2d Cir. 2001). In that case, pretrial detainees held at the New York City Department of Corrections challenged the agency's "Red I.D." and "restraint status" policies. *Benjamin*, 264 F.3d at 181. Detainees who had been found to possess a weapon while in the agency's custody were assigned Red I.D. status. *See id.* When they were moved outside a facility, their hands were placed in black tube-"security mitts," which were typically attached to a waist chain; the detainees' hands were also cuffed behind their back facing outwards. *See id.* The detainees were also placed in leg irons and, during their courthouse visits, they could be shackled this way for up to fourteen hours. *See id.* Restraint status, which was more restrictive, was reserved for individuals who had committed a violent act while in custody. *See id.* This latter group of detainees were subject to the same restraints as Red I.D. inmates, not only when they were moved outside the jail, but also when they were moved *within* the jail (*e.g.*, to the clinic, recreation area, or law library). *See id.*

As in the instant case, the *Benjamin* plaintiffs argued that they were denied due process in connection with their Red I.D. and restraint status classifications—some plaintiffs, for example, were not charged with rule violations or provided hearings, others did not receive written decisions or

responses to appeals—and the district court agreed.  *See id.* at 182.  Judge Baer concluded that:

> [R]estraint status and Red I.D. status. . . . can prove to be a painful restraint on liberty.  Inmates testified that the restraints sometimes resulted in welts and scars on their bodies. . . . These extraordinary restraints on the liberty of pretrial detainees require a prompt hearing and periodic review and their use must be carefully supervised so that they become neither unnecessary nor harmful.

*Benjamin*, 102 F. Supp. 2d at 175.

The Second Circuit affirmed, stating that "[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause" and that this interest "survives a criminal conviction and incarceration, pretrial detention, or involuntary civil commitment."  *Benjamin*, 264 F.3d at 188 (citing *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982)).

*Ashby I* cited *Benjamin* for the proposition that Plaintiffs' rights had been clearly established. *See Ashby*, 2018 WL 6704744, at *6.  However, as noted *supra*, recent governing authority stresses the importance in qualified immunity cases of an analysis that is "particularized to the facts of the case."  The facts in *Benjamin* differ from the instant case in a significant way: it involved pretrial detainees, rather than convicted prisoners.  The Second Circuit acknowledged this distinction on appeal:

> The [district court] rejected precedents from cases concerning pretrial detainees. . . . While convicted prisoners "do not shed all constitutional rights. . . . [d]iscipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law."

*Benjamin*, 264 F.3d at 189 (quoting *Sandin*, 515 U.S. at 485).  More recently, the Second Circuit rejected a convicted prisoner's argument that he was placed in restraints without due process, noting that *Benjamin* "addressed the process due pre-trial detainees, who have a greater liberty interest in being free from restraint than do convicted prisoners."  *Walker v. Fischer*, 523 F. App'x 43, 44 n.1

(2d Cir. 2013) (summary order).  Although a pretrial detainee's right to due process may have been clearly established at the time the Northern administrators implemented the restraint policy, it is not clear that the same can be said for convicted prisoners.

The Second Circuit's emphasis on the prisoner-detainee distinction also belies any argument that the alleged right was "clearly foreshadowed."  *See Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) ("Even if this Court has not explicitly held a course of conduct to be unconstitutional, we may nonetheless treat the law as clearly established if decisions from this or other circuits clearly foreshadow a particular ruling on the issue." (citation and internal quotation marks omitted)). Rather, the case at bar presents very different circumstances.  Beyond the fact that Plaintiffs are convicted prisoners, Plaintiffs experienced restraints that were far less onerous.  The *Benjamin* detainees were shackled for up to fourteen hours and their "restraints sometimes resulted in welts and scars."  *Benjamin*, 264 F.3d at 175, 181.  There is no evidence in the record indicating that Plaintiffs were restrained for such prolonged periods of time or that they were physically harmed by the restraints at Northern.

The Court also notes that the ruling in *Ashby I* cited *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) as a source of Plaintiffs' rights.  In *Colon*, the plaintiff challenged the duration of his confinement to a segregated housing unit (SHU) for 305 days.  *See id.* at 230.  The plaintiff was placed in a solitary confinement cell and remained there for twenty-three hours a day, he was only permitted to exercise for one hour a day, he was limited to two showers a week, and he was denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling.  *See id.*  The Second Circuit concluded that this 305-day period in SHU was a "sufficient departure from the ordinary incidents of prison life to require procedural due

process protections under *Sandin.*" *Id.* at 231.

The expanded evidentiary record on the present motion for summary judgment indicates that *Colon* is distinguishable from the case at bar. The court in *Colon* analyzed a host of restrictive conditions that the plaintiff experienced—that is, "the normal conditions of SHU confinement in New York"—not a single restriction, similar to the restraint policy in the case at bar. *Id.* at 230.[8] Additionally, the aggregate amount of time that the *Colon* plaintiff was subject to SHU's restrictions was much greater than the Plaintiffs in the case at bar. As mentioned above, for 305 days, the *Colon* plaintiff was placed in solitary confinement and remained there for twenty-three hours a day. *See id.* In the instant case, on the other hand, the Court's qualified immunity analysis asks if convicted inmates' right to be free from restraints while traveling in prison for routine movements and *short durations*. Plaintiffs do not assert that they were restrained anywhere close to twenty-three hours per day.[9] Therefore, the Second Circuit's emphasis in *Colon* on a 305-day "durational line" is less applicable to Plaintiffs' claim in this case because the *Colon* plaintiff's aggregate amount of time in restraints was far greater. *Id.* at 231.

Having reconsidered the question, the Court now concludes that the Defendants are entitled to summary judgment on their defense that qualified immunity bars Plaintiffs' claims for due process

---

[8] For similar reasons, and as Defendants point out, a number of Supreme Court and Second Circuit cases involving placement in restrictive statutes are less relevant to the instant case because they likewise analyzed a host of restrictive conditions. Defs.' Mem. at 44–45; *see also Tellier v. Fields*, 280 F.3d 69, 74 (2d Cir. 2000) (analyzing a number of restrictions imposed on SHU prisoners); *Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999).

[9] As noted above, the Parties dispute the exact amount of time each day during which Plaintiffs were restrained. *See supra* Part I. The resolution of this factual dispute, however, does not preclude summary judgment. Even if Plaintiffs had been restrained for hours at a time—which they do not contend—Plaintiffs did not possess a "clearly established" right to be free from restraints during movements within Northern; and Defendants are entitled to qualified immunity on this claim.

violations in connection with Northern's out-of-cell restraint policy.

The Defendants, experienced and responsible officers of DOC and the Northern prison facility, assessed the subjective and objective circumstances attendant upon the confinement of death row inmates, and concluded that the policy, while highly restrictive, was reasonably necessary to ensure the security and safety of all concerned.

Plaintiffs say Defendants' conclusion was wrong. And assume, *arguendo*, that it was. Even so, Defendants are entitled to qualified immunity from liability for the policy if it was objectively reasonable for them to believe that the policy did not violate Plaintiffs' liberty interests. To state the proposition somewhat differently, Defendants enjoy qualified immunity *unless* a rational jury could find that Defendants' judgment was so flawed that no reasonable prison administrator would have fashioned a similar policy.

The Court does not think a rational jury could make that finding. The inherent risks and available safeguards are not subject to precise calculation; they must be measured by responsible officers; and when they do so by issuing a restraint policy, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Francis*, 942 F3d at 146. The Defendants at bar fall within neither of those unprotected species. Defendants are entitled to qualified immunity, and will therefore receive summary judgment on Plaintiffs' restraint policy claims.[10]

---

[10] The Court reached a different conclusion in *Ashby I*, which rejected the qualified immunity defense to the restraint policy claims. This Ruling does not transgress the doctrine that has come to be known as "the law of the case," which "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *DiLaura v. Power Authority of the State of NY*, 982 F.2d 73, 76 (2d Cir. 1992) (citations and internal quotation marks omitted). The doctrine is "discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Virgin Atl. Airways v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). "Law of the case directs a court's discretion, it does not limit

**B.      Due Process Claim as to Loss of Employment and Continued Denial of Employment**

The Parties also dispute whether Plaintiffs' due process rights were violated in connection with the change in their duties that took place after the restraint policy was implemented.  Plaintiffs believe that Conn. Gen. Stat. Ann. § 18-10a ("section 18-10a")—a state law that governed death row inmates' prison conditions—created a liberty interest in employment.[11]  Defendants still dispute this interpretation, claiming Plaintiffs have no right to prison employment.

For the reasons discussed below, the Court agrees with Defendants that section 18-10a did not provide Plaintiffs with a protected interest in employment while on death row.

Inmates have no constitutionally-protected interest in prison employment.  *See Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987) (finding no constitutional right to a job in the absence of underlying state law mandating jobs for prisoners); *Banks v. Norton*, 346 F. Supp. 917, 921 (D. Conn. 1972) (noting that an inmate has no right to a particular job in a prison); *Santiago v. Comm'r of Corr.*, 39 Conn. App. 674, 680 (Conn. App. Ct. 1995) (inmates have "no property or liberty interest in prison employment"); State of Conn. Dep't of Corr. Admin. Directive 10.1(4)A ("No inmate shall have entitlement or a legitimate expectation to any work, programmatic or educational assignment or compensation," with certain exceptions not here relevant).

the tribunal's power."  *Arizona v. California*, 460 U.S. 605, 618 (1983).  "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Virgin Atl. Airways*, 956 F.2d at 1255 (citations and internal quotation marks omitted).  The case at bar presents those grounds, in the form of the post-*Ashby I* appellate decisions and the expanded evidentiary record on this summary judgment motion.

[11]  Section 18-10a has since been repealed, along with other death row-specific laws that became "obsolete."  *See* 2019, P.A. 19-167, § 2.  This has no effect on Plaintiffs' due process claims, however, because the claims accrued from March 2010 to January 2018.  *See also* Defs.' 56(a) ¶ 74 (noting that Plaintiffs were assigned in-cell cleaning duties "[f]ollowing the adoption of the death row restraint policy. . . until the death row restraint policy was abandoned").

However, states may create liberty interests that are protected by the Due Process Clause. *See Sandin*, 515 U.S. at 483–84. Statutory or regulatory language of an "unmistakably mandatory character"—requiring, for example, "that certain procedures 'shall,' 'will,' or 'must' be employed"—can create such an interest. *Hewitt v. Helms*, 459 U.S. 460, 472 (1983).

To establish a protected liberty interest in prison employment, therefore, Plaintiffs must satisfy two elements: (1) the existence of an employment-creating state statute, cast in language of an "unmistakably mandatory character"; and (2) evidence that the deprivation of employment, in violation of that statute, "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Hewitt*, 459 U.S. at 471; *Sandin*, 515 U.S. at 484.[12]

Plaintiffs claim that section 18-10a entitles death row inmates to paying jobs. They claim that before Defendants implemented the death row policy, they were assigned a job with specific duties—to sweep and mop the floors throughout Northern's One East Unit. Pls.' 56(a), at 58 ¶ 1. Under the restraint policy, however, they have only been provided with "do nothing" jobs—that is, jobs where Plaintiffs "don't do [any] actual work," yet they are still paid, because they can no longer carry out their former duties while handcuffed. Pls.' Mem. at 51. Defendants contest this assertion, arguing that every Saturday Plaintiffs are provided with cleaning supplies to clean their own cells,

_____

[12] As the Court previously noted, "[c]onsidering the specifics of Plaintiff's pleadings . . . if Plaintiff[s] ha[ve] any due process protected interest in prison employment, it is a liberty interest, and not a property interest." *Ashby I*, 2018 WL 6704744, at *7 n.5. Plaintiffs renew their claim that they have been denied a liberty interest in connection with their loss of employment. *E.g.*, Pls.' Mem. at 41 ("[T]here is mandatory language in [section 18-10a] that establishes a protected liberty interest in employment."). Had the prisoners asserted a claim of a deprivation of a property interest, rather than a liberty interest, their claim would not have been subject to the additional scrutiny of *Sandin*, which dealt with liberty interests. *See Handberry v. Thompson*, 446 F.3d 335, 353 n.6 (2d Cir. 2006) ("*Sandin* was concerned with the proper definition of liberty interests, not property interests. Perhaps for that reason, this Circuit has continued to focus on the type of language used in a statute that is alleged by a party to have created a property interest.").

which "is a work assignment." Defs.' Mem. at 32; Defs.' Reply at 7–8. Defendants claim, in any event, that section 18-10a does not confer upon Plaintiffs a right to employment. *Id.*

As an initial matter, there is some evidence in the record suggesting that Plaintiffs' assignments *do* constitute work assignments. According to Plaintiff Campbell, prior to the restraint policy, he had never been paid to clean his cell, the showers, or to keep the day room and library clean because "someone else was assigned to keeping the dayroom [and] library clean." Campbell Decl. at 31 ¶ 40. Campbell's statement suggests that someone else had been employed in this capacity, and that Plaintiffs assumed such individual's cleaning job.

Typically, this factual dispute might preclude summary judgment. But, regardless of the resolution of the dispute—if Plaintiffs were merely assigned less desirable responsibilities (Defendants' contention), or lost their jobs entirely (Plaintiffs' claim)—Defendants would prevail because Plaintiffs do not have a protected liberty interest under either scenario.

Turning to the first scenario, courts are in near universal agreement that prisoners have no protected interest in any particular job responsibilities. *See, e.g.*, *Johnson v. Rowley*, 569 F. 3d 40, 44 (2d Cir. 2009); *see also generally* Michael B. Mushlin, *The Right to a Particular Job*, RIGHTS OF PRISONERS § 8:6 (5th ed. 2017). Nor is there any indication from the text of the statute, as discussed in greater detail below, that Plaintiffs were entitled to particular duties. Therefore, Plaintiffs' mere desire to be reassigned to their old duties does not support a due process claim.

The second scenario, that Plaintiffs have lost their jobs entirely, is less clear-cut. According to Plaintiffs, their loss of employment violates section 18-10a (quoted below), which guarantees them a right to prison employment. Still, if Plaintiffs were denied a job altogether—for example, if Plaintiffs are correct that their new assignments are merely a sham—nevertheless summary

judgment must also be granted because section 18-10a does not confer upon Plaintiffs a right to employment. The statute (captioned "[e]mployment of prisoners under death sentence") states the following:

> The Commissioner . . . shall provide for the *employment and utilization* of prisoners under sentence of death whose convictions are being appealed. Nothing in this section shall be construed so as to diminish security precautions for such prisoners, or to require commingling with other prisoners, or to require daily employment.

Conn. Gen. Stat. Ann. § 18-10a (emphasis added). The Parties' dispute whether "employment and utilization" refers to a work assignment, or to more general activities "in which one engages or to which one devotes time." Defs.' Mem. at 7. This is a matter of statutory interpretation.

A district court interpreting a state statute must "carefully predict how the state's highest court would rule if confronted with the issue, including how it would resolve any ambiguity in the statute." *KLC, Inc. v. Trayner*, 426 F.3d 172, 176 (2d Cir. 2005) (citation omitted). The Supreme Court of Connecticut has instructed courts to first "consider the text of the statute itself and its relationship to other statutes." *State v. Leak*, 297 Conn. 524, 532–33 (2010) (citing Conn. Gen. Stat. Ann. § 1-2z). After doing so, if the meaning of the statute is "plain and unambiguous" and it "does not yield absurd or unworkable results," then courts are instructed not to consider extratextual evidence. *Id.* If the statute is not "plain and unambiguous," courts look to its legislative history, the circumstances surrounding the statute's enactment, the legislative policy it was designed to implement, and its relationship to existing legislation and common law principles governing the same subject matter. *See id.*

In *Ashby I*, the Court concluded that "[t]he plain meaning of the statute suggests that Plaintiffs had a protected interest in employment while on death row." *Ashby I*, 2018 WL 6704744,

at *8.  The Court reasoned that a "plain reading" of the statute, as well as the statute's use of

mandatory language—in particular, that the Commissioner "*shall provide* for . . .

employment"—created such an interest.  *Id*.  And, the Court noted that "employment" is generally

"associated with the payment of wages, not merely providing someone with a 'use' or 'purpose, as

Defendants [had] assert[ed]."  *Id*.

However, that conclusion in *Ashby I* was qualified in some respects.  It was grounded, in part,

on Defendants' failure to "put forth a convincing interpretation" of the statute.  *Ashby*, 2018 WL

6704744, at *8.  Defendants only cited to the Merriam-Webster online dictionary in support of their

interpretation of "employment," for example; and they failed to explain why that source, over others,

was the most authoritative.  *See id*.  Further, Defendants likewise failed to "provide[] sufficient

context for the quotes they selected" from the law's legislative history.  *Id*.

On this motion for summary judgment, the evidentiary record is enhanced, and Defendants

have provided more persuasive and expansive arguments in support of their interpretation of the

statute.  For the reasons that follow, the Court concludes that section 18-10a cannot be said to

provide Plaintiffs with a protected interest in employment while on death row.

Turning to the first part of the analysis, section 18-10a's reference to "employment" is

"susceptible to more than one reasonable interpretation."  *Beckworth v. Bizier*, 138 F. Supp. 3d 144,

156 (D. Conn. 2015) (discussing the "test to determine" a statute's ambiguity).  While the noun

could refer to paid "work," as Plaintiffs contend, there is strength to the countervailing argument that

it is broader and refers to inmates' more general participation in activities.  Pls.' Mem. at 46.

Evidence of that broader definition appears in the Fourth Edition of Black's Law Dictionary,

which was in print when the Connecticut legislature passed section 18-10a. *See State v. Menditto*,

315 Conn. 861, 866 (2015) ("Because we seek to discern the intent of the legislature . . . when it enacted [the statute at issue], dictionaries in print at that time are especially instructive.").[13] That dictionary defined employment as "the act of hiring, implying a request and a contract for compensation," as well as the "[a]ct of employing or state of being employed; that which engages or occupies; that which consumes time or attention." BLACK'S LAW DICTIONARY 618 (4th ed. 1951). Likewise, Webster's Third New International Dictionary, which was published the same year that section 18-10a was enacted, defined "employment" as (1) "use, purpose"; (2) "activity in which one engages and employs his time and energies"; and (3) "the act of employing someone or something or the state of being employed." WEBSTER'S THIRD NEW INT'L DICTIONARY 476 (3rd ed. 1963). These definitions indicate that at the time section 18-10a was enacted, "employment and utilization" "was used as a legislative term of art, and that it had acquired a 'peculiar and appropriate meaning in the law.'" *Menditto*, 315 Conn. at 867 (concluding that the word "decriminalize" was a term of art after analyzing contemporaneous editions of dictionaries (quoting Conn. Gen. Stat. Ann. § 1-1(a)).

Additional factors, such as section 18-10a's "relationship to other statues," provide evidence that "employment and utilization" refers more broadly to inmates' general participation in activities. *Leak*, 297 Conn. at 533. For example, section 18-7 (captioned, "[p]owers and duties of warden. Punishment and reward inmates"), which is found in the same chapter as 18-10a, states:

The warden shall manage the Connecticut Correctional Institution,

---

[13] In support of their arguments, both Parties cite to dictionaries that were published *after* the Connecticut legislature enacted section 18-10a. Defs.' Mem. at 14–15, 22; Pls.' Mem. at 46. Likewise, the previous Ruling referred to the Tenth Edition of Black's Law Dictionary, which was published in 2014. *See Ashby I*, 2018 WL 6704744, at *8 n.7. Yet, as mentioned above, it has become clear that the Supreme Court of Connecticut believes that dictionaries in print at the time of a statute's publication "are especially instructive." *Menditto*, 315 Conn. at 866.

> Somers, subject to the direction of the Commissioner of Correction, and he shall keep all the prisoners *employed in such labor* as the commissioner orders, during the term of their imprisonment.

Conn. Gen. Stat. Ann. § 18-7 (emphasis added).[14]

Section 18-7 is relevant for a number of reasons. First, section 18-7 states that prisoners are to be "employed in *such labor*," while section 18-10a omits the word "labor," which is more traditionally associated with individuals' paid work. *Id.* (emphasis added). The legislature could have included the word "labor" in section 18-10a, but it opted against doing so. This legislative

---

[14] At first glance, section 18-7 appears to apply only to DOC's Connecticut Correctional Institution, Somers ("Somers")—now known as the Osborn Correctional Institution ("Osborn")—based on the text of the statute and its location in Chapter 320 ("Correctional Institutions"), Part I ("Connecticut Correctional Institution, Somers") of the Connecticut General Statutes. It appears, however, that the statute was never updated to reflect changes at the DOC. Death row inmates were originally housed at Somers. In 1994, the facility was renamed Osborn; and in 1995, all death row inmates were transferred from Osborn to the newly opened Northern. *See* Connecticut State Department of Correction, *Osborn Correctional Institution*, https://portal.ct.gov/DOC/Facility/Osborn-CI (last accessed Jan. 26, 2019). It seems that 18-7 was never amended to reflect Somers' name change, or the transfer of death row prisoners to Northern. This—and section 18-7's general applicability to death row inmates—is reflected, in part, in section 18-10's legislative history. At a hearing of the Joint Standing Commission on Penal Institutions to discuss section 18-10a, William Graham, a Hartford attorney who appeared to be one of the bill's driving forces outside of the legislature in supporting passage, discussed the relationship between section 18-7 (which was already on the books) and section 18-10a (which was under debate). According to Graham, "in this bill [which contained section 18-10a], all types of leverage is given to the administrators or the board of directors. . . . Section 18-7 provides that the warden shall keep all prisoners employed in such labor that the directors order." Conn. Gen. Assembly, Joint Standing Comm. on Penal Insts. Hearings 78 (Mar. 13, 1963). Graham's testimony supports the proposition that section 18-7 governs the prisoners' claims in the case at bar. Additionally and, in any event, the Connecticut Supreme Court has applied section 18-7's provisions to inmates at other correctional institutions, apart from Somers (now Osborn). *See, e.g.*, *Comm'r of Correction v. Coleman*, 303 Conn. 800, 804 (2012) (noting that DOC officials maintained a duty under section 18-7 to "provide for the relief of any sick or infirm prisoner"—in that case, a prisoner at the McDougall-Walker institution); *cf. Milano v. Warden, Connecticut Corr. Inst.*, 166 Conn. 178, 187 (1974) (concluding that section 18-7's grant of authority to the commissioner to "employ prisoners outside the institution walls" applied to inmates at Enfield because Conn. Gen. Stat. Ann. § 18-14a provided that Enfield inmates were "subject to the provisions of the general statutes applicable to the Correctional Institution, Somers").

decision provides additional evidence that the legislature intended the term "employment and utilization" to encompass something broader than just a mere working relationship. *See Lee v. AIG Cas. Co.*, 919 F. Supp. 2d 219, 228–29 (D. Conn. 2013) ("[T]he use of different words [or the absence of repeatedly used words in the context of] the same [subject matter] must indicate a difference in legislative intention." (citations and internal quotation marks omitted)).

Additionally, section 18-7 provides DOC with discretion—that is, the warden is instructed to "keep all the prisoners employed in such labor *as the commissioner orders*." Conn. Gen. Stat. Ann. § 18-7 (emphasis added). The section's grant of discretion is important because it conflicts with section 18-10's purported employment mandate. Courts are instructed to reconcile potentially-conflicting statutes, however. Indeed, "every effort should be made to find a reasonable field for the operation of both statutes . . . [and] where there is a reasonable field of operation for each statute which does not impinge on the domain of the other, it is the court's duty to give them concurrent effect." *Windham First Taxing Dist. v. Town of Windham*, 208 Conn. 543, 553 (1988).

If the Court were to follow Plaintiffs' interpretation of section 18-10a, it would conflict with section 18-7: while 18-7 would provide discretion to the commissioner to refrain from employing prisoners, 18-10a would take it away. *Cf. Lee v. AIG Cas. Co.*, 919 F. Supp. 2d 219, 228–29 (D. Conn. 2013) (noting that when interpreting state law, "the use of the different words 'shall' and 'may' in the same statute lends support to distinguishing those words according to their ordinary meanings" (citation omitted)). However, the Connecticut Supreme Court has instructed that courts have a duty to "presume that the legislature intended [statutes] to be read together to create a harmonious body of law." *State v. John F.M.*, 285 Conn. 528, 549 (2008). Mindful of that instruction, the Court concludes that section 18-7 grants the commissioner discretion to keep

prisoners employed in such labor as he or she orders, while section 18-10a requires the commissioner to provide for their employment and utilization in a range of activities. This interpretation permits the statutes to coexist without each one impinging on the other.

Turning to the second part of the statutory interpretation analysis—*i.e.*, the "other factors" relevant to determining a law's meaning—the statute's legislative history and purpose provide guidance. *Dina v. Cuda & Assocs.*, 950 F. Supp. 2d 396, 403 (D. Conn. 2013) (citation omitted). As Defendants point out, one of the bill's sponsors, Representative Satter, explained in the Connecticut House that the bill sought to "permit[] a man under sentence of death some form of diversion during that horable [sic] time while his appeals are being processed." Conn. House Proceedings, Vol. X, Part 2, at 4508 (June 1, 1963). Another representative similarly stated that the bill's purpose was to permit prisoners "to have [the] privilege" of "exerciz[ing] outside their cells." *Id.* at 4507–08. Lastly, at a hearing of the Joint Standing Commission on Penal Institutions to discuss the bill, William Graham, the Hartford attorney who supported the bill's passage, *see supra* n.13, spoke in detail about the problems that the bill sought to address: that inmates were confined to their cells for long periods of time, were not permitted to engage in out-of-cell exercise, and could not speak with other prisoners, *see* Conn. Gen. Assembly, Joint Standing Comm. on Penal Insts. Hearings 76–78 (Mar. 13, 1963).[15]

The final factor militating in favor of Defendants' reading of section 18-10a is that the Court owes deference to the DOC's longstanding interpretation of its duties with respect to providing

[15] It is true that State Senator McGuire stated that the bill would "allow the prisoners whose cases are being appealed to do some work to make the time go." Conn. Senate Proceedings, Vol. X, Part 8, at 3035–46 (June 3, 1963). The Court agrees with Defendants, though, that this comment—read in conjunction with the statements of the members of the Connecticut House—tends to support the notion that "employment" encompasses all types of activities, including, but not exclusively, a paid job. Defs.' Mem. at 21.

inmates with work assignments. The Connecticut Supreme Court recently reiterated that courts should defer to an agency's interpretation when it "has been formally articulated and applied for an extended period of time, and that interpretation is reasonable." *Standard Oil of Connecticut, Inc. v. Adm'r, Unemployment Comp. Act*, 320 Conn. 611, 643 (2016). The rationale for deference is two-fold: "a time-tested interpretation, like judicial review, provides an opportunity for aggrieved parties to contest that interpretation" and, "in certain circumstances, the legislature's failure to make changes to a long-standing agency interpretation implies its acquiescence." *Id.*; *see also Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985) ("Judicial reluctance stems not from insensitivity; rather it reflects an awareness of the relatively narrow authority of judges and the appropriate, but by no means unlimited, deference to be accorded the decisions of prison administrators." (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119 (1977)).

In the instant case, DOC's Administrative Directive 10.1.4, which has been in effect since 1994, states that no inmate shall have entitlement or a legitimate expectation to any work. Defs.' Mem. at 26. DOC has revised the directive at least six times over the last twenty-five years; the original interpretation has remained unaltered. *See id.* Should any ambiguity remain as to the meaning of the word "employment," that ambiguity is further resolved by DOC's "time-tested and reasonable interpretation." *City of Hartford v. Hartford Mun. Employees Ass'n*, 259 Conn. 251, 268 (2002) (an agency's interpretation was entitled to deference because it had "consistently . . . interpreted the statute for more than twenty-five years" in the same manner).[16]

---

[16]    Plaintiffs also appear to argue that Defendants violated a separate provision of Administrative Directive 10.1. Ashby Decl. at 51 ¶ 104. That directive outlines DOC's "No Participation, No Pay" policy, which states that "[a]n inmate shall only be paid a single day's pay for actual participation in an assignment to which he/she is classified." Administrative Directive 10.1 ¶ 5(G). Contrary to Plaintiffs' argument, the policy tends to support Defendants' argument that Plaintiffs in fact have been employed; if they had not "actual[ly] participat[ed] in an assignment,"

Plaintiffs nonetheless claim that Defendants' creation of a "Death Row Job Assignments" sheet, which outlined death row inmates' revised job responsibilities "due to the new Restraint Policy," indicates that Defendants actually believed that section 18-10a required DOC to provide Plaintiffs with jobs. Pls.' Mem. at 47–48 (citing Compl. at 24). Put another way, Plaintiffs argue that Defendants' "interpretation of [the statute] [was] reflected in their actions." *Id*. But, the revised assignment sheet explicitly states that "inmates are assigned *at the discretion* of the Unit Manager and based on the *[u]nit needs*." Compl. at 24 (emphasis added). Thus, contrary to Plaintiffs' assertion, the document suggests that officials believed that they retained discretion and were not required to provide employment to inmates.

For the reasons stated above, the Court concludes that the term "employment" in section 18-10a does not require DOC to provide death row inmates with a paid job.[17] In consequeunce, Plaintiffs did not have a liberty interest in employment, and Defendants' motion for summary judgment is granted with respect to Plaintiffs' due process employment claim.[18]

inmates theoretically would not have been paid under this directive.

[17] Section 18-10a does not provide Plaintiffs with a guaranteed prison job for the additional reason that the statute contains a catchall provision at its end stating that, "[n]othing in this section shall be construed so as to diminish security precautions for such prisoners." Conn. Gen. Stat. Ann. § 18-10a. Although the Parties did not extensively brief this issue, and therefore the Court will not address it in detail, the Court believes that it provides DOC with significant discretion in the manner in which it decides to maintain security in a complex prison environment. *See also* Conn. Gen. Assembly, Joint Standing Comm. on Penal Insts. Hearings 78 (Mar. 13, 1963) (proponent of section 18-10a's passage explaining that the bill's catchall provision regarding security precautions "gives the board of directors . . . wide leverage"). The evidence in the case indicates that the restraint policy was promulgated as a security precaution after a series of violent altercations between inmates and prison guards. Defs.' Mem. at 24.

[18] Because the Court determined that section 18-10a does not confer upon Plaintiffs a liberty interest, the Court need not analyze Defendants' other arguments in support of summary judgment with respect to Plaintiffs' employment-related due process claim (*e.g.*, exhaustion and that Defendants are entitled to qualified immunity).

## IV.   **CONCLUSION**

For the reasons discussed herein, Defendants' motion for summary judgment is GRANTED as to all claims asserted in the Complaint.  Plaintiffs' Complaint is DISMISSED.  The Clerk is directed to terminate all pending motions and close the file.

It is SO ORDERED.

Dated:        New Haven, Connecticut
              March 10, 2020

*/s/ Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge
